# United States Court of Appeals for the Federal Circuit

04-1215

MATTHEW STEPHENS and
SPECTRUM LABORATORIES, INC.,

Plaintiffs-Appellants,

v.

TECH INTERNATIONAL, INC. (doing business as Health Tech)
and LAITH R. HADDAD,

Defendants-Appellees.

Michael D. Rounds, Watson Rounds, of Reno, Nevada, argued for plaintiffs-appellants. With him on the on the brief was Matthew D. Francis.

John F. Morrow, Jr., Womble Carlyle Sandridge & Rice, PLLC, of Winston-Salem, North Carolina, argued for defendants-appellees. With him on the brief was David S. Bradin.

Appealed from: United States District Court for the District of Nevada

Judge David W. Hagen

# United States Court of Appeals for the Federal Circuit

04-1215

MATTHEW STEPHENS and
SPECTRUM LABORATORIES, INC.,

Plaintiffs-Appellants,

v.

TECH INTERNATIONAL, INC. (doing business as Health Tech)
and LAITH R. HADDAD,

Defendants-Appellees.

_____

DECIDED:    December 29, 2004
_____

Before MAYER*, RADER and SCHALL, Circuit Judges.

MAYER, Circuit Judge.

Matthew Stephens and Spectrum Laboratories, Inc. (collectively "Spectrum") appeal the order of the United States District Court for the District of Nevada granting defendants-appellees Tech International, Inc.'s and Laith R. Haddad's (collectively "Tech's") motion for attorney's fees under 35 U.S.C. § 285. Stephens v. Tech Int'l, Inc., No. 01-CV-0070 (D. Nev. Nov. 12, 2003) ("Section 285 Order"). Because the district court erred in finding the case exceptional, we reverse.

_____

\* Judge Haldane Robert Mayer vacated the position of Chief Judge on December 24, 2004.

<u>Background</u>

Spectrum is the owner of United States Patent No. 6,162,647 ("'647 patent"), which is directed to a method for removing unwanted substances from human urine samples using chromium trioxide[1] in an aqueous solution while leaving unchanged one of certain other desired indicia (e.g., pH, nitrogen content, saccharide content, red blood cell count, or total solids content) and color. The originally-filed patent application contained two independent claims and sixteen dependent claims. The disputed method was initially represented by original independent claim 1 and dependent claim 2:

1. A method to remove unwanted substances from urine samples comprising contacting the urine sample with an amount of a chemical oxidizing agent sufficient to oxidize at least 25% of the unwanted substance in a volume of urine while leaving the various physical indicia characteristics of urine unaffected.
2. The method of claim 1 wherein the oxidizing agent is selected from the group consisting of hydrogen peroxide, benzoyl peroxide, chromium trioxide, sodium permanganate, and potassium permanganate.

In the first office action, the United States Patent and Trademark Office ("PTO") rejected all claims under 35 U.S.C. § 112, ¶ 1, for lack of enablement because the specification neither described the unwanted substances to be removed nor enabled the removal of the unwanted substances while leaving the desired physical indicia unchanged. The PTO rejected all claims under 35 U.S.C. § 112, ¶ 2, for indefiniteness of, <u>inter</u> <u>alia</u>, the claim 1 phrases "the various physical indicia," "the sample," "the unwanted substance," and "a volume of urine." The claims were also rejected under 35 U.S.C. § 103 for obviousness in light of the Schwarzhoff, Adamczyk, and Smith prior art references, which teach the use of: (1) bleach, vinegar, and lemon juice (Schwarzhoff);

---

[1] "Chromium trioxide" and "chromic acid" are interchangeable names for $CrO_3$.

hydrogen peroxide and peracids (Adamczyk); and (3) vinegar, lemon juice, and hydrogen peroxide (Smith) as urine additives.

In response to this office action, Stephens canceled claims 2 and 11-18, and amended claim 1 as follows:

> A method to remove detectable amounts of an unwanted substance from a human urine sample comprising:
> obtaining a human urine sample having detectable amounts of an unwanted substance <u>selected from the group consissting [sic] of testosterone, estrogen, progesterone, anabolic steroids, ibuprohpan [sic], acetaminophen, acetosalicylic acid, Benzedrine, 3,4,5-trimethoxy-benzedrine, tetrahydrocannabinol, cocaine, morphine, codeine, nicotine, ethyl alcohol, and acetaldehyde[;]</u>
> contacting the human urine sample with an amount of a chemical oxidizing agent <u>selected from the group consisting of chromium trioxide, sodium permanganate, and potassium</u> permanganate sufficient to oxidize at least 25% of the unwanted substance in a volume of urine while leaving the various physical indicia characteristic of the urine sample unaffected.

(Emphases added.)

In its final rejection, the PTO issued an indefiniteness rejection for, <u>inter alia</u>, the claim 1 phrases "the various physical indicia" and "a volume of urine sample." The PTO also issued an obviousness rejection for the claims based on Nebinger, which teaches using sodium dichromate[2] as an oxidant to reduce the amount of cannabinoid or opiate in a urine sample. The examiner stated that: (1) it would have been obvious to optimize the concentration of sodium bichromate for the elimination of unwanted substances; and (2) with respect to chromium trioxide, it would have been obvious to use the acid in place of the salt [sodium dichromate] for its known chemical similarity. The examiner

---

[2] "Sodium bichromate" and "sodium dichromate" are interchangeable names for $Na_2Cr_2O_7$.

also rejected the claims as obvious based on Nebinger in light of Johnston, which teaches the use of potassium dichromate and potassium permanganate to remove interfering substances from urine samples.

In response to the final rejection, Stephens canceled claim 10 and amended claim 1, naming only chromium trioxide as an oxidizing agent and specifying that at least one physical indicium and color were to remain unchanged. Claim 1 in issued form reads:

> A method to remove detectable amounts of an unwanted substance from a human urine sample comprising:
> obtaining a human urine sample having detectable amounts of an unwanted substance selected from the group consisting of testosterone, estrogen, progesterone, anabolic steroids, ibuprofen, acetaminophen, acetylsalicylic acid, amphetamine, tetrahydrocannabinol, cocaine, morphine, codeine, nicotine, ethyl alcohol, and acetaldehyde;
> contacting the human urine sample with an amount of chromium trioxide, sufficient to oxidize at least 25% of the unwanted substance in a volume of urine while leaving at least one physical indicia selected from the group consisting of pH, nitrogen content, saccharide content, red blood cell count, and total solids content characteristic of the urine sample unaffected, while leaving the color of the resulting solution substantially unaffected.

'647 patent, col. 6, ll. 26-46 (emphasis added). Stephens specifically cited the fact that his invention differed from Nebinger's in teaching the maintenance of color and one physical indicium after application of the oxidizer, while Nebinger taught color change. This amendment was accepted, and the '647 patent issued.

Spectrum sued Tech in the district court for patent infringement and cybersquatting in violation of 15 U.S.C. § 1125(d). Tech counterclaimed for, inter alia, summary judgment of noninfringement and invalidity. The district court granted partial summary judgment of noninfringement to Tech, holding no literal infringement because

claim 1, which only claimed chromium trioxide, did not read on Tech's accused product, which used sodium dichromate. Stephens v. Tech Int'l, Inc., No. 01-CV-0070 (D. Nev. May 7, 2002) ("Summary Judgment Order"). It also held that the prosecution history of the '647 patent estopped Spectrum from claiming infringement under the doctrine of equivalents. Tech moved in camera for section 285 attorney's fees, which the trial court denied as premature because Tech stood to recover additional attorney's fees if its remaining counterclaims survived trial. A subsequent settlement agreement was reached between the parties whereby all claims except for Tech's claim for section 285 attorney's fees were dismissed with prejudice. After supplemental briefing, the trial court granted Tech's motion for attorney's fees, finding the case exceptional upon deciding that: (1) Spectrum's infringement suit was frivolous and in bad faith; (2) Spectrum's 35 U.S.C. § 154(d)(1) notification regarding a separate patent application was litigation misconduct; and (3) Spectrum's background investigation and credit check on Haddad conducted after summary judgment of noninfringement was vexatious behavior. Spectrum appeals the court's finding the case exceptional under section 285. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## Discussion

The determination whether to award attorney's fees under section 285 involves a two-step process. First, the district court must determine whether Tech proved by clear and convincing evidence that this case is "exceptional." 35 U.S.C. § 285 (2000); Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc). We review de novo whether the district court applied the proper legal standard under section 285, and we review the court's factual findings, including whether the case is exceptional, for

clear error. Forest Labs., Inc. v. Abbott Labs., 339 F.3d 1324, 1328 (Fed. Cir. 2003). We will hold the district court's finding clearly erroneous when, despite some supporting evidence, we are "left with the definite and firm conviction that a mistake has been committed." Id. at 1328 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). Second, if the court finds the case to be exceptional, it must then determine whether an award of attorney's fees is appropriate, a determination we review for an abuse of discretion. Cybor Corp., 138 F.3d at 1460.

On appeal, Spectrum argues that the district court found this case exceptional under section 285 based upon three erroneous factual findings: (1) that Spectrum had engaged in bad faith litigation by suing Tech for infringement; (2) that Spectrum had committed litigation misconduct by giving Tech section 154 notice of potential infringement regarding an unrelated patent application; and (3) that Spectrum's background investigation and credit check on Haddad constituted vexatious behavior and evidence of litigation misconduct.

We agree with Spectrum that the district court erred in finding this case exceptional. Section 285 provides that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Such "exceptional" cases involve inequitable conduct before the PTO, litigation misconduct, vexatious and otherwise bad faith litigation, frivolous suit or willful infringement. Forest Labs., 339 F.3d at 1329. None of those circumstances is present here. We will address the district court's three factual determinations supporting its exceptional case finding in turn.

## I.

"A frivolous infringement suit is one which the patentee knew or, on reasonable investigation, should have known was baseless." Haynes Int'l Inc. v. Jessop Steel Co., 8 F.3d 1573, 1579 (Fed. Cir. 1993), reh'g granted on other grounds, 15 F.3d 1076 (Fed. Cir. 1994). Therefore, the pertinent inquiry is whether Spectrum knew or should have known that it could not successfully assert the '647 patent against Tech but pursued its infringement claim anyway.

The district court erred in concluding that Spectrum's suit was frivolous. First, Spectrum's direct infringement claim was justified in light of Merck & Co. v. Teva Pharmaceuticals USA, Inc., 347 F.3d 1367 (Fed. Cir. 2003). In that case, the claims at issue specifically used the term "acid" in claiming the administration of alendronic acid for the treatment of urolithiasis and bone reabsorption disorders. Id. at 1369. In holding that the sodium salt form of the claimed acid literally infringed, the court relied on three factors: (a) the specification contained numerous references to the salt form of the claimed acid; (b) testimony from all qualified witnesses asserted that "persons in this field would understand the acid is the active agent and that the acid is administered in the form of the salt"; and (c) "extensive evidence that persons experienced in this field use the same lexicography as did the inventors in referring to the active ingredient 'in the form of' the salt." Id. at 1371. These three factors informed the ultimate inquiry: whether persons skilled in the art of treating bone disease understood that the use of the acid encompassed the administration of the salt. Id. In that case, the court answered in the affirmative.

Here, the question is not whether a general chemist would know the difference between an acid and a salt. The question is whether a person experienced in the field of this invention (i.e., urinalysis) and familiar with the prior art, reading the patent specification, would know that for the removal of unwanted substances from urine samples, the use of chromium trioxide to remove said unwanted substances encompasses the administration of the salt form.

The record allows us also to answer this ultimate question in the affirmative. Stephens, himself an experienced chemist, confirmed the general knowledge that both chromium trioxide and sodium dichromate, when placed in an aqueous solution, form either chromate ($NaCrO_4$), dichromate, or chromic acid, their amounts varying depending on the solution's pH. Thus, when placed in an aqueous solution, chromic acid and sodium dichromate are identical. Stephens' findings were confirmed by Dr. Charles Rose, an experienced chemist retained by Spectrum. Finally, and most telling, the PTO recognized the fundamental similarity between the acid and salt. The examiner relied upon experiments using sodium dichromate to allow Spectrum's claim of the use of chromium trioxide: "It is the examiner's position that sodium bichromate is sufficiently chemically similar to chromium trioxide that a showing with respect to sodium bichromate is indicative of the performance of chromium trioxide." Nov. 22, 1999, Notice of Allowability, at 3. The allowance of the '647 patent was based not upon a distinction between the acid and the salt, but on the fact that the prior art failed to leave at least "one of the claimed indicia and color substantially unaffected." The only statement challenging the fact that the acid and salt only differed by pH was provided by

Tech's counsel, David Bradin, a chemist and patent attorney, who provided only a conclusory opinion as to the lack of similarity between the acid and salt.

While the '647 patent does not use the word "salt," the compelling evidence in this case that persons of skill in the field of urinalysis know of chromic acid and sodium dichromate's interchangeable use for removal of unwanted substances in urine samples outweighs that fact. We do not announce that all claims of an acid inherently claim the acid's salt form; it must still be determined whether or not persons having skill in the applicable art deem the acid and salt to be interchangeable. Because the use of chromic acid encompasses the use of sodium dichromate in the field of urinalysis, Spectrum had adequate grounds to believe that Tech directly infringed the '647 patent. Thus, the district court erred by finding Spectrum's suit for literal infringement to be frivolous and in bad faith.

The district court also erred in finding that Spectrum had no basis for suing under the doctrine of equivalents. In its summary judgment order, the court said that Spectrum had given up any claim to the salt when it narrowed its claims to include only chromium trioxide in the face of Nebinger's prior art, which taught the use of sodium dichromate. Summary Judgment Order, slip op. at 6. Spectrum did not limit claim 1 to chromium trioxide as forced by Nebinger's teaching of sodium dichromate. As we have said, Spectrum narrowed its claim in light of Nebinger only to the extent of claiming that one of Spectrum's claimed indicia and color remain substantially unaffected. Thus, because prosecution history does not bar a claim of equivalence, such a claim was logical because both chromium trioxide and sodium dichromate were placed in aqueous solutions to perform the removal function claimed by the '647 patent. In light of the

record as a whole, Spectrum inherently claimed the use of sodium dichromate when it claimed chromium trioxide.  Therefore, the litigation was not brought in bad faith.

II.

The district court found litigation misconduct based on Spectrum's May 31, 2002, letter placing Tech on notice of potential infringement of potentially-patentable subject matter contained in a separate patent application, United States Patent Application Serial No. 09/776,222 ("the '222 application").  Sections 154(d)(1)[3] and (2)[4] permitted Spectrum to obtain reasonable royalties for activities amounting to infringement of the '222 application's claims if: (1) the issued patent claims are substantially identical to the claims in the published application; and (2) Tech had actual notice of the published patent application.  The '222 application, published on May 23, 2002, claimed a method to remove unwanted substances from a urine sample using an iodine-based oxidizing agent, subject matter wholly separate from the '647 patent.  Spectrum believed that one of Tech's products infringed several claims of the pending application, and, as a result, sent Tech a letter on May 31, 2002, providing section 154 notice.  The district court cited this notification, as well as the fact that no prior art disclosure had been filed, as evidence of litigation misconduct.

---

[3] In relevant part, 35 U.S.C. § 154(d)(1) states:
> [A] patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application . . . and ending on the date the patent is issued . . . makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States . . . and . . . had actual notice of the published patent application.

[4] In relevant part, 35 U.S.C. § 154(d)(2) states:
> The right under paragraph (1) to obtain a reasonable royalty shall not be available under this subsection unless the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application.

While the district court did not err in considering the possibility that Spectrum's section 154 notification was part of a scheme of misconduct in the '647 patent litigation, it did err in finding that Spectrum's otherwise valid section 154 notice amounted to misconduct. First, Spectrum operated within its rights under section 154 when it notified Tech of potential infringement. The letter represented Spectrum's adherence to section 154's requirement that Tech be placed on notice of Spectrum's future right to obtain royalties if a patent issued in a form substantially identical to the published '222 application. Second, Spectrum did not harass Tech by sending the section 154 notice while the '222 application was being amended. The application was actually amended after the section 154 notice was sent to Tech. Further, Spectrum was not required to withdraw its section 154 notice; it believed Tech still infringed the amended claims, and had a right to await possible patent issuance to see if its infringement allegations were correct. Third, the fact that no Information Disclosure Statement ("IDS") accompanied the '222 application is not, standing alone, evidence of wrongdoing. Spectrum was permitted to file an IDS, if deemed material, at any point during the prosecution of the application. See 37 C.F.R. 1.56(a) (2000). Nothing in section 154 required that Spectrum file an IDS prior to delivering notification of potential infringement. Finally, the mere timing of Spectrum's section 154 notice to Tech (during settlement negotiations after the trial court's noninfringement finding) did not raise Spectrum's actions to the level of litigation misconduct.

III.

The district court's third basis for its exceptional case finding was Spectrum's background investigation and credit check of Haddad. The court relied heavily on the

fact that these activities occurred after its summary judgment order of noninfringement, stating that the court could "imagine no legitimate litigation interest" served by the investigations. Summary Judgment Order, slip op. at 6.[5]

A district court must provide reasoning for its determination that a case is exceptional for us to provide meaningful review. Superior Fireplace Co. v. Majestic Prods. Co., 270 F.3d 1358, 1377 (Fed. Cir. 2001). Further, an exceptional case finding is not to be based on speculation or conjecture but upon clear and convincing evidence. See In re Hyatt, 211 F.3d 1367, 1371 (Fed. Cir. 2000). The facts cited in the section 285 order do not provide clear and convincing evidence that Spectrum's investigation and credit check constituted vexatious behavior. The section 285 order merely highlighted the fact that the credit check and background investigation occurred after issuance of the summary judgment order. Section 285 Order, slip op. at 3. The district court's open speculation about the purpose of Spectrum's investigations adds no support to its finding.

## Conclusion

Accordingly, the order of the United States District Court for the District of Nevada is reversed.

## REVERSE

---

[5] We assume that the district court meant to call this activity vexatious and, thus, litigation misconduct. The summary judgment order does not explicitly label Spectrum's actions here as either; instead, it called Spectrum's background investigation and credit check "plainly odious." Summary Judgment Order, slip op. at 6.